IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


MICHAEL DOE, by and through his parents )
and natural guardians, RACHEL and )
MICHAEL DOE, )
                                   )
            Plaintiff, )
                                   )
            v. )          Civil Action No. 03-717
                                   )
The SOUTHEASTERN GREENE SCHOOL )
DISTRICT; RICHARD HAUGER, individually )
and in his capacity as Principal of Mapletown )
Junior High School; PHILIP SAVINI, )
individually and in his capacity as Superintendent )
of Southeastern Greene School District, )
                                   )
           Defendants. )


<u>MEMORANDUM ORDER</u>

CONTI, District Judge

        In this memorandum order, the court considers the motion for summary judgment filed by

defendants the Southeastern Greene School District ( the "school district"), Richard Hauger

("Hauger"), and Philip Savini ("Savini")(referred to collectively as "defendants").  After

considering the joint statement of material facts, the respective motions and briefs submitted by

the parties, the court will grant defendants' motion in part by dismissing plaintiff's due process

claim against all defendants and will deny the remainder of defendants' motion for the reasons

set forth.

### *Factual Background*

In the 2002-2003 school year plaintiff Michael Doe ("Michael" or "plaintiff") was a seventh grade student in Mapletown High School ("MHS") in the school district.  Joint Statement of Material Facts ("J.S.") ¶ 1.  Savini is the superintendent for the school district.  J.S. ¶ 2.  Hauger is the principal of MHS.  Id. ¶ 3.

Prior to attending MHS, plaintiff attended Bobtown Elementary School for the fifth and sixth grades.  Id. ¶ 4.  Michael was teased during the fifth grade due to his weight.  Id. ¶¶ 5, 48.  Michael was not in the same classes with his tormentors in the sixth grade.  Id. ¶ 49.  Michael began attending MHS in the seventh grade.  Id. ¶ 6.  Michael was teased again in the seventh grade.  Id. ¶ 50.  Michael had all of his classes with his previous tormentors during the seventh grade year at MHS.  Id. ¶ 51.

Early in the school year, five to seven boys were bothering Michael.  Id. ¶ 9.  During the seventh grade year, Michael, during the homeroom period, told a friend that he was gay.  Id. ¶ 7.  Upon hearing the information, Michael's friend repeated it in a loud voice so that other students could hear it.  Id.   The teasing and harassment of Michael escalated substantially after this event.  Id. ¶ 8.

Michael was teased because of his sexuality.  Id. ¶ 13.  Two boys, Brandon G. ("Brandon") and Craig J. ("Craig") continued to bother Michael.  Id. ¶ 11.  Michael was called a "faggot" and his tormentors teased him by referring to a "gay dance."  Id. ¶ 14.  Brandon and Craig repeatedly asked Michael for a "blow job" or to "make out."  Id. ¶ 53.  They pretended to masturbate in front of him, exposed themselves to him, and sexually touched him.  Id.  Brandon jabbed Michael in the buttocks with a pencil.  Id.  Brandon also placed his hand in his own pants

2

and then rubbed his hand in Michael's face.  <u>Id.</u>  Brandon and Craig threatened to beat Michael. <u>Id.</u>  Craig tried to show Michael his penis and asked him to "make out" before Michael's last day of school in November 2002.  <u>Id.</u>

In September and October 2002, Michael reported the abuse to two of his teachers, Mrs. Jeffreys ("Jeffreys") and Mr. Mikalik ("Mikalik").  <u>Id.</u> ¶ 58.  Most of the abuse was taking place in Jeffreys' and Mikalik's classrooms.  <u>Id.</u>  Michael complained to Hauger about the abuse five or six times.  <u>Id.</u> ¶ 59.  Michael told Hauger about Brandon pretending to masturbate and actually masturbating in class and "trying to expose himself to Michael and all the other girls."  <u>Id.</u> Michael also told Hauger that Craig was doing the same things.  <u>Id.</u>  Michael's mother, Rachel Doe ("Rachel"), also spoke with Hauger four or five times about the same issues.  <u>Id.</u> ¶ 60. Rachel first spoke to Hauger a few days after Michael received a note reading "die faggot" in his locker at school.  <u>Id.</u>

After Michael was stabbed in the buttocks by Brandon in early November 2002, Michael explicitly told Hauger that some of his classmates were masturbating in front of him, exposing themselves to him, and asking for "blow jobs."  <u>Id.</u> ¶ 61.  Hauger recalled these conversations. <u>Id.</u> ¶ 62.

Rachel went to a school open house on November 13, 2002, and complained to Michael's teachers about the abuse.  <u>Id.</u> ¶ 69.  Two teachers said there was nothing that they could do.  <u>Id.</u> Another teacher said that if Michael would be more manly and stand up to his tormentors, then maybe they would not pick on him.  <u>Id.</u>  Rachel told one of Michael's teachers, Mrs. Smearchek ("Smearchek"), that several girls were also being tormented by the same boys.  <u>Id.</u> ¶¶ 16, 69.

3

Smearchek, the very next day, asked girls that had experienced harassment to come forward and report it.  Id.  The school district immediately commenced an investigation.  Id.

When Michael discovered that an investigation was underway into the girls' complaints, while his repeated harassment were not addressed, he wrote: "This is an OUTRAGE!  I have been constantly going to the office repeatedly for verbal bashing and sexual harassment and these girls go ONCE and they've got the school board in here!!!!"  Id. ¶ 70.  Michael described himself as going "totally berserk" over the injustice, but also stated, "I've found out that the girls have been having the same problem as me."  Id.

 The school district asked a constable to conduct an investigation.  Id. ¶ 17.  Upon completion of the investigation, criminal charges were filed against Brandon and Craig.  Id.  At one point, Michael wrote:  "It's gotten to the point where I can hardly concentrate on my school work, and I'm afraid to got to school because I fear for my safety."  Id. ¶ 68.

On November 18, 2002, Brandon and Craig were suspended for ten days and expulsion proceedings were initiated.  Id. ¶ 18.  On that same date, attorney Sally L. Apter ("Apter") wrote to the school district and asked that Michael be returned to school and changed to a different class or group.  Id. ¶ 31.  On November 19, 2002, Michael was admitted to a hospital for treatment of depression and suicidal ideations.  Id. ¶ 23.  On November 22, 2002, Michael attended his last day of school at MHS.  Id. ¶ 22.  Michael told the intake workers at River Park Hospital that "I'm here because a couple of kids at school are gay bashing."  Id. ¶ 24.  On November 25, 2002, Michael informed his family doctor, Dr. Byron, that he planned to try to return to school the next day.  Id. ¶ 25.

4

On November 27, 2002, the school district received a fax from River Park Hospital stating that Michael should be transferred to another school, or, as a second choice, receive homebound education.  Id. ¶¶ 32, 75.

On December 11, 2002, Rachel, Michael's mother, sent a letter to the school district requesting due process for Michael to determine where he should be placed for schooling.  Id. ¶ 33.  Rachel asked for due process, even though she did not understand what it was, because an attorney told her to write a letter and request it.  Id. ¶ 34-35.  Rachel followed the request for due process with an inquiry regarding the school district's "Gifted Program."  Id. ¶ 36.  The school district proved the information.  Id. ¶ 36.  On December 6, 2002, Rachel submitted a request for homebound instruction for Michael along with a supporting note from Dr. Byron.  Id. ¶ 38.  Dr. Byron's note mistakenly referred to home schooling, not homebound instruction.  Id. ¶ 39.  A second request was submitted.  Id. ¶ 40.  The second request contained another note from Dr. Byron requesting homebound instruction for the remainder of the school year.  Id. ¶ 40.

At that time, the school district had adopted a policy regarding homebound instruction.  Id. ¶ 41.  The policy provided for five hours of homebound instruction per week or twenty hours per month.  Id. ¶ 42.  Basil Zaycosky ("Zaycosky") was assigned to be Michael's homebound instructor.  Id. ¶ 43.  On December 13, 2002, Hauger told Zaycosky that homebound instruction for Michael was approved and directed him to contact Rachel and begin homebound instruction.  Id. ¶ 44.  Hauger also instructed Michael's teachers to contact his mother to discuss his academic progress with her.  Id. ¶ 46.

During the time between the suspension and the conclusion of expulsion proceedings, Brandon's and Craig's teachers were instructed to monitor closely their classroom behavior and submit a written report.  Id. ¶ 19.

Craig agreed to withdraw from MHS and transfer to another school. Id. ¶ 20.  Brandon elected to proceed to an expulsion hearing. Id. ¶ 21.  Following the hearing, Brandon was expelled.  Id.

On December 4, 2002, Michael began seeing a therapist named Cheryl L. Dennis ("Dennis").  Id. ¶ 26.  At his last session, Michael told Dennis that he wanted to return to school and that he felt safe in returning there.  Id. ¶ 27.  Michael also told Dennis that he feared telling his mother that he wanted to return school.  Id. ¶ 28.  Michael feared that his mother would feel that he did not appreciate all she had done for him.  Id.  Michael told Dennis that he did not want to back to school and "give up his rights."  Id. ¶ 29.  Dennis was not able to explore these feelings in any more depth because Michael never returned for treatment and his family did not respond to attempts by Dennis to schedule another appointment.[1] Id. ¶ 30.

In August of 2003, Michael's family moved out of the school district to Portsmouth, Virginia.  Id. ¶ 47; Pl's App. 38-39.

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of

---

[1] The psychotherapy sessions with Dennis were not covered by Michael's medical insurance.  After terminating his sessions with Dennis, Michael continued to receive psychotherapy from Dr. Kim Watson ("Watson") until his family's move to Virginia.  Pl's App. 39.

material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining

whether the dispute is genuine, the court's function is not to weigh the evidence or to determine

the truth of the matter, but only to determine whether the evidence of record is such that a

reasonable jury could return a verdict for the non-moving party.  Id. at 249.  The court may

consider any material or evidence that would be admissible or usable at trial in deciding the

merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing

WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35,

39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1956), cert.denied, 355 U.S. 964 (1956) ("in

considering a motion for summary judgment, the court is entitled to consider exhibits and other

papers that have been identified by affidavit or *otherwise made admissible in evidence*")

(emphasis added).

### *Analysis*

There are two remaining claims in this case: 1) plaintiff's Title IX claim against the

school district and 2) plaintiff's due process claims against all defendants.  Defendants move for

summary judgment on two grounds.  First, they argue that plaintiff failed to establish a claim

under Title IX because Title IX does not apply to discrimination based upon sexual orientation.

Second, defendants argue that plaintiff's due process claim fails because the evidence of record

establishes that plaintiff did, in fact, receive homebound instruction.  The court will address each

of defendant's arguments in turn.

### I.       Plaintiff's Title IX Claim

Defendants argue that plaintiff's claim against the school district under Title IX is a claim

for harassment on the basis of sexual orientation.  They argue that claims for discrimination

based upon sexual orientation under Title VII have been rejected by the United States Court of

Appeals for the Third Circuit.  See Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257,

261 (3d Cir. 2001)("It is clear, however, that Title VII does not prohibit discrimination based on

sexual orientation.").  While Bibby was a case decided in the Title VII context, defendants note

that courts, including the United States Supreme Court, have looked at Title VII interpretations

of discrimination when considering Title IX because both statutes prohibit discrimination on the

basis of sex.  See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999); Franklin v. Gwinnett

County Public Schools, 503 U.S. 60, 75 (1992).  Defendants, therefore, posit that because claims

for discrimination on the basis of sexual orientation do not exist under Title VII, it must be the

case that they cannot exist under Title IX either[2].

    Plaintiff, in response, admits that Bibby stands for the proposition that claims for

discrimination on the basis of sexual orientation are not actionable under Title VII.  Plaintiff

argues, however, that his claim against the school district under Title IX is a claim not for sexual

orientation discrimination, but for discrimination "*on the basis of sex*."  Pl's Brief at 2.

    The United States Congress, in passing 20 U.S.C. § 1681, mandated that no person in the

United States shall be discriminated against on the basis of sex under any education program

receiving federal financial assistance.

        No person in the United States shall, on the basis of sex, be
        excluded from participating in, be denied the benefits of, or be

---

[2]While not mentioned in defendants' briefing, the court feels compelled to note that recipients of federal funds, namely, the school district in this case, have a scope of damages liability for sexual harassment under Title IX that is limited to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the harassment occurs.  Only then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs."  Davis v. Monroe County Bd. Of Educ., 526 U.S. 629, 645 (1999).  This standard is known as the deliberate indifference standard. Defendants do not contest their potential liability for damages on this point in their motion for summary judgment

> subjected to discrimination under any education program or
> activity receiving Federal financial assistance. . . .

20 U.S.C. § 1681 ("Title IX").

The United States Supreme Court held that student-on-student sexual harassment is a form of discrimination within the meaning of Title IX. Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 650 (1999)("Having . . . determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute.")[3]. As it is clear that student-on-student sexual harassment is actionable under Title IX, the court must now consider whether harassment on the basis of sex, specifically male-on-male sexual harassment, is actionable under Title IX. As noted above, the United States Supreme Court has applied Title VII principles in the Title IX context. Olmstead, 527 U.S. at 616 (citing to Franklin); Franklin, 503 U.S. at 75 (relying on a Title VII case to find a claim under Title IX for harassment by a teacher against a student).

In the Title VII context, the United States Supreme Court, in Oncale v. Sundowner Offshore Services, Inc., held that claims of discrimination on the basis of sex where the plaintiff and defendant are both the same gender are actionable.[4] 523 U.S. 75, 79 (1998)("If our

---

[3]In Davis, the Supreme Court also held that actions against schools boards for student-on-student harassment may lie only when the funding recipient, i.e., the school board, acts with "deliberate indifference to known acts of harassment in its programs or activities" and only when the harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Davis, 526 U.S. at 633.

[4]This holding has been followed by the United States Court of Appeals for the Third Circuit. "The Court reasoned that it is not the sex of the harasser or the victim that is important to a sexual harassment claim, but, rather, what is important is that the victim 'prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discriminat[ion] . . . because of sex".'" Bibby, 260 F.3d at 262.

9

precedents leave any doubt on the question, we hold today that nothing in Title VII necessarily

bars a claim of discrimination 'because of... sex' merely because the plaintiff and the defendant

(or the person charged with acting on behalf of the defendant) are of the same sex.").  The Court

in <u>Oncale</u> went on to note:

> We see no justification in the statutory language or our precedents
> for a categorical rule excluding same-sex harassment claims from
> the coverage of Title VII.  As some courts have observed, male-on-
> male sexual harassment in the workplace was assuredly not the
> principal evil Congress was concerned with when it enacted Title
> VII.  But statutory prohibitions often go beyond the principal evil
> to cover reasonably comparable evils, and it is ultimately the
> provisions of our laws rather than the principal concerns of our
> legislators by which we are governed.  Title VII prohibits
> 'discrimination . . . because of . . . sex' in the 'terms' or
> 'conditions' of employment.  Our holding that this includes sexual
> harassment must extend to sexual harassment of any kind that
> meets the statutory requirements.

<u>Oncale</u>, 523 U.S. at 79-80.

The court finds this passage in <u>Oncale</u> particularly persuasive.[5]  While student male-on-

male sexual harassment may not have been the principal evil that Congress was concerned with

when it enacted Title IX, the language of the statute, as well as applicable precedent such as

<u>Oncale</u>, support the finding that student male-on-male sexual harassment is actionable under

Title IX.  The language in Title IX – "No person in the United States shall, on the basis of sex ...

---

[5]Many other courts have come to this same conclusion.  <u>See</u> <u>Schroeder ex rel. Schroeder</u>
<u>v. Maumee Bd. of Educ.</u>, 296 F.Supp.2d 869, 879-80 (N.D.Ohio 2003)(holding that harassment
due to the plaintiff's perceived sexual orientation could be considered harassment on the basis of
sex under Title IX); <u>Montgomery v. Independent School Dist. No. 709</u>, 109 F.Supp.2d 1081,
1090-01 (D.Minn. 2000)(holding that students harassing another student on the basis that he was
homosexual was sufficient to proceed under a Title IX sexual harassment claim); <u>Carrasco v.</u>
<u>Lenox Hill Hosp.</u>, 2000 WL 520640, at *8 (S.D.N.Y. Apr. 28, 2000)(finding that the plaintiff's
claim for discrimination based on sex under Title VII was actionable because the comments
"focused on the sexual conduct of plaintiff as a man."); <u>Galdieri-Ambrosini v. Nat. Realty &</u>
<u>Dev.</u>, 136 F.3d 276, 289 (2d Cir. 1998)(holding that evidence of sexual stereotypes may be proof,
in a Title VII employment context, that an abusive environment was based on gender).

be subject to discrimination . . . " – makes no distinction on the basis of gender nor does it indicate that a claim exists only for opposite sex sexual harassment.

After the United States Supreme Court's decision in <u>Oncale</u>, the United States Court of Appeals for the Third Circuit squarely addressed the issue of how to prove a same-sex harassment claim in the Title VII context. <u>Bibby</u>, 260 F.3d at 262. The court in <u>Bibby</u> found that there are at least three ways by which a plaintiff can prove that same-sex harassment amounts to discrimination on the basis of sex.

> Thus, there are at least three ways by which a plaintiff alleging same-sex sexual harassment might demonstrate that the harassment amounted to discrimination because of sex–the harasser was motivated by sexual desire, the harasser was expressing a general hostility to the presence of one sex in the workplace, or the harasser was acting to punish the victim's non-compliance with gender stereotypes.

<u>Bibby</u>, 260 F.3d at 264.[6]

Plaintiff elected to proceed under the third theory, i.e., that Michael did not conform to the gender stereotype of a middle school male.[7] In proving any evidentiary theory, a plaintiff

---

[6]The court in <u>Bibby</u> expressly noted that this list of three theories is not exhaustive and that other ways to prove harassment because of sex may be available. <u>Bibby</u>, 260 F.3d at 264.

[7]This theory can be traced to the United States Supreme Court's decision in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989). In <u>Price Waterhouse</u>, a plurality of the Court held that discrimination based on sexual stereotypes was actionable under Title VII. "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." 490 U.S. at 250. The United States Court of Appeals for the Third Circuit referenced the United States Court of Appeals for the Seventh Circuit's holding in <u>Doe v. City of Belleville</u>, 119 F.3d 563, 576 (7th Cir. 1997), *vacated on other grounds*, 523 U.S. 1001 (1998), in <u>Bibby</u> when it held that failure to conform to sexual stereotypes may be actionable as sex discrimination under Title VII. In <u>City of Belleville</u>, the court found that a plaintiff could proceed under a claim for sexual discrimination on a theory that the victim's harassers sought to punish him for failing to live up to gender stereotypes. <u>Id.</u> The United States Court of Appeals for the Third Circuit found that the United States Supreme Court's decision vacating <u>City of Belleville</u> on other grounds did not disturb the gender stereotypes cause of action finding and this theory of liability is still viable absent an

must prove that the conduct at issue was "not merely tinged with offensive sexual connotations"
but actually amounted to discrimination based on the plaintiff's sex.[8]  Bibby, 260 F.3d 264.
Once this type of showing has been made, the sexual orientation of the plaintiff is irrelevant to
the court's inquiry.  Id. at 265.  In addition, when a plaintiff proves that he was harassed because
of his sex, "it is no defense that the harassment may also have been partially motivated by anti-
gay or anti-lesbian animus."  Id.

To succeed against a funding recipient, like the school district, for discrimination on the
basis of sex, a plaintiff must show: the recipient was deliberately indifferent to the harassment,
"of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that
it can be said to deprive the victim of access to the educational opportunities or benefits provided
by the school."  Davis, 526 U.S. at 650.  Defendants did not challenge any of these elements in
their motion for summary judgment.  Defendants' argument in their motion emphasized only that
plaintiff could not proceed under Title IX on a theory of liability for harassment based upon
sexual orientation.

 Deliberated indifference is limited to "circumstances wherein the recipient exercises
substantial control over both the harasser and the context in which the harassment occurs.  Only
then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it
'under' the recipient's programs."  Davis, 526 U.S. at 645.  The court concludes a jury could find
that the school district, in its role, exercised control over both Michael's tormentors and Michael.
This issue was not contested by defendants in their motion.

_____

explicit statement from the United States Supreme Court repudiating the Price Waterhouse
holding.  Bibby, 260 F.3d at 263n.5.

 [8]In Bibby, the plaintiff's claim failed because he did not argue that he failed to comply
with societal stereotypes of how men ought to behave.

It is undisputed that Michael complained to his teachers on several occasions about the harassment. It is also undisputed that Rachel spoke to Hauger on four to five different occasions about the harassment, beginning after Michael received a note in his locker that stated "die faggot." For these reasons, the court finds that a jury could infer that the school district had actual knowledge of Michael's harassment.

It is also undisputed that Michael told a friend that he was gay and that friend repeated that information so that other students could hear it. It is also undisputed that Michael was called names like "faggot" and was teased by something called the "gay dance." Brandon and Craig, in particular, asked Michael for "blow jobs" or pretended to masturbate in front of him. Those two boys masturbated in front of him, exposed themselves to him, and sexually touched him. Brandon jabbed Michael in the buttocks with a pencil as well as putting his hand down his own pants and rubbing his hand in Michael's face. Michael also alleged that other students called him names and confronted him for "wanting ass instead of pussy." Michael was admitted to a hospital for depression and suicidal ideations. On these facts, the court concludes that Michael adduced enough evidence that a jury could find that his harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis, 526 U.S. 650.

As the Court in Oncale noted:

> Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct
>
>  which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Oncale, 523 U.S. at 82.  The court finds, drawing all inferences in favor of the non-moving party,

that plaintiff can proceed on his claim of sex discrimination under Title IX.  Defendants' motion

for summary judgment relating to plaintiff's Title IX claim is **DENIED.**[9]

## II.    Plaintiff's Due Process Claim

Defendants also filed a motion for summary judgment with respect to plaintiff's claim for

a violation of due process against all defendants.  Defendants argue that the school district cannot

be held liable because there is no evidence that it had a policy, custom, or practice against

providing or interfering with homebound instruction.  Defendants also argue that Savini and

Hauger cannot be held liable for a violation of plaintiff's constitutional rights because there is no

evidence that they participated in any violation.  Plaintiff's complaint alleges that his due process

rights were violated due to the school district's failure to enact a defined homebound education

policy that ensured a minimum education for plaintiff.

### A.    Due Process Claim against the School District

The United States Supreme Court in Monell v. New York City Dept. of Social Services,

436 U.S. 658, 694-95 (1978), held that a municipality or government entity can be found liable

under 42 U.S.C. § 1983[10] only when the municipality itself causes the constitutional violation.

City of Canton v. Harris, 489 U.S. 378, 387 (1989); Carswell v. Borough of Homestead, 381

---

[9]The court notes that, in its memorandum order of August 23, 2004, the court dismissed
Count II of plaintiff's complaint and found that the claims in Count II were subsumed into
plaintiff's Title IX claim in Count I.  The issues of violations of equal rights that were found in
Count II still survive in plaintiff's claim at Count I.

[10]42 U.S.C. § 1983 provides, in relevant part: "Every person who, under color of any
statute, ordinance, regulation, custom or usage . . . subjects or causes to be subjected, any citizen
of the United States or other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party
injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

F.3d 235, 244 (3d Cir. 2004).  The Court specifically recognized in <u>Monell</u> and <u>City of Canton</u>, that *respondeat superior* or vicarious liability will not attach under section 1983.[11]  <u>Id.</u>  Under section 1983, a government entity will be liable only when the "execution of the government's policy or custom . . . inflicts the injury. . . ."  <u>Monell</u>, 436 U.S. at 694.  District courts are instructed to evaluate claims for municipal liability "independently of the section 1983 claims against the [government employees]."  <u>Carswell</u>, 381 F.3d at 244 (quoting <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1213 (3d Cir. 1996); <u>Fagan v. City of Vineland</u>, 22 F.3d 1283, 1294 (3d Cir. 1994)).

This court, accordingly, must begin its inquiry in this case which alleges governmental liability under section 1983 by considering "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  <u>City of Canton</u>, 489 U.S. at 385.  "A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom police come into contact."  <u>Carswell</u>, 381 F.3d at 244 (citing <u>City of Canton</u>, 489 U.S. at 388).

The Supreme Court directly addressed the issue whether a government entity could be held liable under section 1983 if a municipal employee employed a constitutionally valid policy in an unconstitutional manner in <u>City of Canton</u>.  <u>Id.</u>  The Court in <u>City of Canton</u> expressly rejected the notion advanced by a municipality that only unconstitutional policies are actionable under section 1983.  <u>Id.</u>

Typically, a plaintiff proves that a municipal policy or custom amounts to deliberate indifference to the constitutional rights of citizens by showing a pattern of constitutional violations.  <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000).  "Although it is

---

[11]"Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior*."  <u>City of Canton</u>, 489 U.S. at 387.

possible to maintain a claim of failure to train without demonstrating such a pattern, the [court] made clear that the burden on the plaintiff in such a case is high. . . ." <u>Id.</u>

> If, as here, the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice."

<u>Id.</u> (quoting <u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 407 (1997)). In addition to proving deliberate indifference, a plaintiff must also show causation. <u>Carswell</u>, 381 F.3d at 244. "There must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" <u>Id.</u> (quoting <u>Brown v. Muhlenberg Township</u>, 269 F.3d 205, 214 (3d Cir. 2001)).

The evidence of record indicates that the school district did have a policy on homebound instruction. Appx. at 65. The policy provided for five hours a week of homebound instruction. <u>Id.</u> There is no evidence of record adduced by plaintiff to indicate that the district had a policy or custom of denying students homebound instruction. The court can find no evidence that the school district engaged in a pattern of deliberate indifference to plaintiff's constitutional rights. The court will grant defendants' motion for summary judgment in favor of the school district with respect to plaintiff's due process claim.

**B.     Due Process Claim Against Savini and Hauger**

Defendants also move for summary judgment as to Savini and Hauger with respect to plaintiff's due process claim. Defendants argue that there is no evidence that Savini or Hauger prevented or interfered with Michael's homebound instruction. Plaintiff did not address this argument in his briefing.

"It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." C.H. *ex rel.* Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000); see also Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Township, 50 F.3d 1186, 1190 (3d Cir. 1995).

Plaintiff did not adduce any evidence that either Savini or Hauger attempted to prevent or failed to approve plaintiff's homebound instruction. In fact, the evidence of record indicates that the opposite is true. On December 13, 2002, Hauger told Zaycosky that homebound instruction for Michael was approved and directed him to contact Rachel and begin homebound instruction. Hauger also instructed Michael's teachers to contact his mother to discuss his academic progress with her. There is no evidence of record that Savini attempted to thwart Michael's homebound instruction.

The court notes that the United States Court of Appeals for the Third Circuit, in affirming a grant of summary judgment by the district court on a section 1983 claim, described a factual situation similar to the one in this case.

> As we have noted, there is no allegation that Oliva, Pratt, Johnson,
> or the Board of Education participated in or approved the removal
> or restoration decisions and the Board of Education is not alleged
> to have established or approved any policy, custom or practice.

Oliva, 226 F.3d at 202.

The court, therefore, will grant defendants' motion for summary judgment in favor of defendants Savini and Hauger with respect to plaintiff's due process claim against them.

### *Conclusion*

After reviewing the undisputed material facts of record, the court determines that defendants' motion for summary judgment shall be denied as to plaintiff's Title IX claim and granted as to plaintiff's due process claims against all defendants.

### *Order*

**AND NOW**, this 24th day of March 2006, upon consideration of the parties' arguments and supporting documents

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. No. 31) is **GRANTED IN PART and DENIED IN PART**.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc:      Counsel of record

18